**UNITED STATES of America,**
**Plaintiff,**

v.

**GLAXO GROUP LIMITED and Imperial**
**Chemical Industries Limited,**
**Defendants.**

**Civ. A. No. 558–68.**

United States District Court
District of Columbia.

June 4, 1969.

James H. Wallace, Jr., Richard H. Stern and William B. Bohling, Antitrust Div., Dept. of Justice, Washington, D. C., for the Government.

Henry P. Sailer, Washington, D. C., for defendant Glaxo Group Limited.

Sigmund Timberg and George Mobille, Washington, D. C., for defendant Imperial Chemical Industries Limited.

William Glendon, Washington, D. C., for Johnson & Johnson.

Kevin Carroll, New York City, for Shering Chemical Co.

## MEMORANDUM OPINION

GASCH, District Judge.

This antitrust suit, brought pursuant to section four of the Sherman Act,[1] by the Department of Justice, seeks declaratory and injunctive relief against two British corporations for alleged violations of section one of the Sherman Act.[2] The Court heard the matter on the several motions of both the plaintiff and defendants and pursuant to this opinion, by order, will: (1) grant the motion of the United States for a partial summary judgment on the restraint on alienation issue, and deny the motion of defendant ICI for a partial summary judgment that the United States has failed to establish a Sherman Act violation or that the case is moot; (2) grant the motion of defendant ICI for a partial judgment under Rule 12(c); (3) deny the motion of the United States for leave to amend the complaint; (4) sustain Glaxo's objection to

1. 15 U.S.C. § 4.

2. 15 U.S.C. § 1.

the ruling of the Pretrial Examiner dated November 25, 1968, and overrule the Government's objections to the rulings of the Pretrial Examiner dated November 6 and 15, 1968.

The following background is noted from the complaint and memoranda. It is not found as fact.

## I. BACKGROUND

Defendants Glaxo Group Limited (hereinafter "Glaxo") and Imperial Chemical Industries Limited (hereinafter "ICI") are British corporations [3] which own United States patents.[4]

Bulk form griseofulvin is an antibiotic, antifungal agent which may be cut with inert ingredients and administered orally for the treatment of external fungus infections. The Glaxo and ICI patents purport to relate to this dosage form. Griseofulvin is not the subject of a United States patent in its common, bulk form.

### A. COMPLAINT

The Government first asserts that a Glaxo-ICI patent interchange [5] is an illegal combination (horizontal) to pool patents and to license them in a manner which unreasonably restrains trade in griseofulvin in violation of section one of the Sherman Act. It then alleges that pursuant to this combination, Glaxo entered into license agreements with Johnson and Johnson, Inc. (hereinafter "Johnson") and Schering, Inc. (hereinafter "Schering"), and ICI with American Home Products Corp. (hereinafter "AMHO"), under which Glaxo and ICI agreed to sell bulk griseofulvin to the licensees and the licensees were authorized to make, sell and use griseofulvin in dosage form. Each agreement provided that the licensee would not resell griseofulvin in bulk form to any independent third party without the licensor's express written consent. Additionally, the Government alleges that the ICI patent is invalid under 35 U.S.C. §§ 100, 101 and 112.

The Government asserts that the effects of the alleged combinations and agreements are: "to prevent competition between the defendants and the licensees in the sale of griseofulvin in bulk form; to prevent competition among the licensees in the sale of griseofulvin in bulk form; to guarantee each licensee freedom from competition from others resulting from the sale of bulk form griseofulvin by licensees to such others; to control and restrain the licensees in respect to the manner in which, and the persons through whom, they market griseofulvin; to prevent access by third persons to sources of griseofulvin in bulk form; to prevent third persons from packaging bulk form griseofulvin into dosage form and selling it for use by consumers; to place restrictions on, or to subject to conditions, the resale of griseofulvin which the licensees purchase from defendants; to deprive the public, and particular consumers of drugs, of the benefits of free and open competition in griseofulvin." [6]

### B. SERVICE OF PROCESS

Neither Glaxo nor ICI is alleged to have transacted any business in the United States. Service of process was attempted on both by mailing copies of the complaint to their respective home offices in London, England, pursuant to 35 U.S.C. § 293 and Federal Rule 4 (i). Glaxo's motion to quash this service was denied by the Chief Judge of this Court on April 30, 1968; and, accordingly, the matters presently before the Court were heard on the several motions of plaintiff and both defendants.[7]

---

3. As of June 30, 1966, Glaxo had total assets of approximately $180 million. ICI's net income in 1965 was approximately $140 million. As of December 31, 1966, its total assets were approximately $4.2 billion.

4. See *infra*, note 8.

5. Report of the Atty.Gen.Comm. to Study the Antitrust Laws at 242 (1955) [hereinafter "Atty.Gen.Report"].

6. Gov't complaint at 6–7.

7. The litigants incorrectly assume that this ruling on jurisdiction is a binding "rule of the case" while it is in this

## C. MOTIONS

Those motions include: plaintiff's motion for summary judgment against ICI on a restraint on alienation theory; ICI's motion for partial summary judgment on the grounds of mootness and failure to establish a violation of the Sherman Act; ICI's motion for judgment under Rule 12(c); plaintiff's motion for leave to amend the complaint; Glaxo's objection to the ruling of the Pretrial Examiner dated November 25, 1968; plaintiff's objection to the ruling of the Pretrial Examiner of November 6, 1968; and, plaintiff's objection to the Pretrial Examiner's ruling dated November 15, 1968. Plaintiff's motion for a partial summary judgment that ICI's patent is invalid has been postponed by stipulation pending the Court's decision on the above-described motions. For purposes of oral argument, and by the agreement of all parties, these motions were divided into and argued as four "packages."

## II. RESTRAINT ON ALIENATION PACKAGE

The United States has moved for a partial summary judgment declaring the ICI-AMHO bulk sale restriction to be a *per se* violation of the Sherman Act under the *Schwinn* doctrine.[8] ICI has cross moved for a summary judgment that the Government has failed to establish a Sherman Act violation. The following are undisputed facts for purposes of this motion.[9]

## A. UNDISPUTED PRIMARY FACTS

1. Glaxo is a British corporation organized and existing under the laws of Great Britain. Its principal place of business is London, England. Glaxo owns four United States patents.[10] (Complaint, ¶¶ 1, 3; Cross Motion of ICI for Summary Judgment 11/14/68 [hereinafter ICI Cross Motion] ).

2. ICI is a British corporation organized and existing under the laws of Great Britain. Its principal place of business is London, England. ICI owns a United States patent.[11] (Complaint, ¶¶ 1, 3; ICI Cross Motion).

3. Bulk form griseofulvin is an antibiotic compound which may be cut with inert ingredients and administered orally in the form of capsules or tablets to humans or animals for the treatment of external fungus infections. There is no substitute for dosage form griseofulvin in combatting certain infections. The Glaxo and ICI patents purport to relate to this dosage form. Common, bulk form griseofulvin is not the subject of any United States patent. (Complaint, ¶¶ 11, 12; ICI answer to U. S. interrogatory ##1, 36, ICI Cross Motion).

4. On September 12, 1958, ICI and AMHO executed a contract constituting AMHO an exclusive distributor of ICI pharmaceutical products in the United States. (Appendix to ICI Memo, 11/12/68).

---

Court. It is appropriate for a court to inquire into its jurisdiction and should there be further proceedings directly involving Glaxo in this Court, this Court will need to make such an inquiry. *Compare* North Branch Prods, Inc. v. Fisher, 179 F.Supp. 843, *rev'd on other grounds* 109 U.S.App.D.C. 182, 284 F.2d 611 (1960); *cert. denied* 365 U.S. 827, 81 S.Ct. 713, 5 L.Ed.2d 705 (1961) *with* 35 U.S.C. § 293 and *cf.* Kennedy, Patent and Antitrust Policy: The Search for a Unitary Theory, 35 Geo.Wash.L.Rev. 512, 529–531 n. 117 (1967); and ruling *infra* on ICI's Rule 12(c) motion.

8. United States v. Arnold Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed. 2d 1249 (1967) [hereinafter "*Schwinn*"].

9. These are taken from facts offered or acknowledged by the defendant and not objected to by the Government, undisputed documents or affidavits.

10. No. 2,843,527 issued July 15, 1958, and styled "Production of griseofulvin in low nitrogen level medium;" No. 2,938,835 issued May 31, 1960, and styled "Production of mutants of the Genus Penicillum;" No. 2,986,496 issued May 30, 1961, and styled "Production of antibiotics and antibiotic-containing products;" and No. 3,008,876 issued November 14, 1961, and styled "Compositions containing Griseofulvin."

11. No. 2,900,304 issued August 18, 1959, and styled "Griseofulvin uses and compositions."

5. On April 26, 1960, Glaxo and ICI entered into an agreement which provided *inter alia:*

(a) ICI would purchase supplies of bulk form griseofulvin from Glaxo;

(b) "ICI undertakes not to sell and to use its best endeavours to prevent its Subsidiaries and Associate from selling any griseofulvin in bulk to any Independent Third Party without GLAXO's express consent in writing;"

(c) ICI acquired the right to manufacture bulk form griseofulvin in the United Kingdom under Glaxo's United Kingdom patents;

(d) ICI was entitled to sell bulk form griseofulvin and preparations containing it in the United States;

(e) ICI was authorized to sub-license under Glaxo's United States griseofulvin patents;

(f) Glaxo was authorized to manufacture dosage form griseofulvin in the United Kingdom and to sub-license Johnson and Schering in the United States to make, use and sell griseofulvin preparations. (Government Exhibit #3).

6. On October 4, 1962, ICI entered into an agreement with AMHO. That agreement provided *inter alia:*

(a) ICI agreed to sell bulk form griseofulvin to AMHO;

(b) The sale purported to be subject to the conditions of the Glaxo-ICI agreement of 1960;

(c) In regard to bulk sales the agreement stated: "You [AMHO] will not, without first obtaining our [ICI's] consent, resell, or re-deliver in bulk supplies of griseofulvin;"

(d) AMHO was authorized to process the bulk form griseofulvin into tablets or capsules—its dosage form—and to sell it in that dosage form. (Government Exhibit #4).

7. There is a provision, identical to the above-quoted bulk sale provision (#6(c), *supra*) in each of eight other agreements between ICI and AMHO. (ICI answer to U. S. interrogatory #49).

8. Since 1962 and up until the filing of the complaint, ICI has sold griseofulvin in bulk form to AMHO in amounts exceeding $200,000. (See #10, *infra*).

9. ICI licensed AMHO under ICI's dosage patent to process bulk griseofulvin into pills. (Government Exhibit 4, ¶ 10).

10. Since 1962 and up until the filing of the complaint, AMHO has sold griseofulvin in dosage form only to third parties in amounts exceeding $200,000. (Wallace affidavit of 11/14/68 and sources cited therein; ICI answer to U. S. interrogatory ##40, 42).

11. AMHO has declined to sell bulk form griseofulvin to third parties without first receiving ICI's permission. (Interrogatories 67 and 74, and answers, and see #10, *supra*).

12. In September, 1967, T. W. M. Bland, of ICI, received a letter from an official at AMHO, Maurice E. Silverstein, indicating that the United States Department of Justice was investigating the bulk sale agreement. (ICI answer to U. S. interrogatory #53; Bland affidavit, 11/6/68; Hoare affidavit, 5/16/68).

13. In October, 1967, without referring to Glaxo, ICI executed a letter cancelling the bulk sale provisions relating to griseofulvin and the eight other pharmaceutical product agreements with AMHO. (ICI answer to interrogatory #49; Hoare affidavit, 5/16/68).

14. ICI has filed affidavits with the Court swearing that it will not reinstate the bulk sale provision in the agreements from which it has been deleted (Hoare affidavit, 5/16/68; Bland affidavit, 11/6/68) and ICI has stated that its intention in deleting the bulk sale provision from the griseofulvin and other agreements was to remove restrictions on the freedom of AMHO to resell the bulk supplies. (Hoare affidavit, 5/16/68; Bland affidavit, 11/6/68; ICI answer to plaintiff's interrogatory #50).

15. ICI has offered to grant non-exclusive licenses under the ICI dosage

**6**

patent at reasonable terms and conditions and notice of such offer has been directed to the Commissioner of Patents for publication in the Official Gazette. (Kokulis affidavit, 11/7/68).

16. ICI "regards such a restriction [bulk sale restriction] as justifiable in appropriate cases and views the Government's complaint as strictly limited to Griseofulvin." (Hoare affidavit, 5/16/68, at ¶ 9).

17. It is ICI's general, routine practice to include bulk sale restrictions in sales agreements for all its pharmaceutical products. (Hoare affidavit, 5/16/68, at ¶ 4).

## B. INFERENCES

■ The material facts are not in dispute. The defendant argues, however, that the inferences to be drawn from these facts are either disputed or as a matter of law must be resolved in its favor by the granting of its cross motion for summary judgment. If, of course, there are inferences which are both material and disputed, then the Court, particularly in this complex antitrust litigation, could not invoke the extraordinary procedure of summary judgment.[12] Here, however, scrutiny of the pleadings and the "archeology" of the case leads the Court to the conclusion that defendant's assertions of dispute are insubstantial, that the inferences are either clear as a matter of law or immaterial and that there would be no material dispute of fact or inference to be resolved at trial.

ICI argues that the facts relating to the patent interchange are irrelevant to the single motion before the Court on the vertical restraint issue. While it is of course true that the characterization and legality of the horizontal aspects of this case are not now before the Court, the Court has found the alleged horizontal factual context helpful background to the proper understanding of the vertical setting and has accordingly considered it only to that end.

Defendant's primary contention is that the covenant in question—

You [AMHO] will not, without first obtaining our [ICI's] permission, resell or re-deliver in bulk supplies of griseofulvin—

is not an agreement to restrain the alienation of bulk griseofulvin, that permission is not prohibition, that it was never intended to be a restraint and that it never operated as such a restraint.

ICI also argues, however, by way of justification, that this covenant which routinely appears in ICI's agreements around the world[13] had as its purpose the reservation of power in ICI to guarantee the maintenance of proper health standards.[14] It admits that its intention in cancelling the provision was to free AMHO from restraints on its power to resell bulk griseofulvin.[15] ICI admits, therefore, that the agreement effected a retention of power in the vendor, ICI, over the goods it sold its vendee, AMHO. It is not disputed that a sale rather than a consignment or agency was involved.

## C. ULTIMATE FACTS

Thus, the Court finds it undisputable: (1) that there was an agreement between ICI and AMHO the terms of which

---

12. Poller v. Columbia Broadcasting, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). *See* Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (April 7, 1969); Citizen Publishing Co. v. United States, 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (March 10, 1969). *See generally,* Washington v. Cameron (D.C.Cir. 3/4/69); Thompson v. Evening Star Newspaper Co., 129 U.S.App.D.C. 299, 394 F.2d 774 (1968); Semaan v. Mumford, 118 U.S.App.D.C. 282, 335 F.2d 704 (1964); Johnson v. American

General Insurance Co., 296 F.Supp. 802, 803 (D.D.C.1969).

13. Hoare affidavit, 5/16/68. *But see generally* Fashion Originators' Guild v. F. T. C., 312 U.S. 457, 465, 61 S.Ct. 703, 85 L.Ed. 949 (1941) (self-appointed policing of design pirates) and *e. g.*, 21 U.S.C. §§ 351–360a; 21 C.F.R. §§ 130–146(e) (Federal drug regulations).

14. Bland affidavit, 11/6/68, Hoare affidavit, 5/16/68.

15. *Id.*

called for the sale by ICI to AMHO of bulk form griseofulvin with a reservation of power in the seller to control when, where, to whom, and under what conditions the bulk form might be resold in order to ensure proper worldwide medical standards for its use and preparation; (2) that more than $200,000 of commerce in the griseofulvin market is involved; and (3) that the agreement was practiced—a substantial quantity of bulk form griseofulvin was sold to AMHO; AMHO did not resell griseofulvin in bulk to third parties, but rather sought ICI's permission; AMHO sold substantial quantities of griseofulvin only in dosage form.

## D. ARGUMENT AND CONCLUSIONS OF LAW

Defendant raises several legal arguments. All but one are of little consequence.[16]

ICI hesitatingly agrees that the amount of commerce involved is legally substantial. It disagrees with the Government's methods of valuation, particularly with the use of the cut form of the drug as a standard since that estimate amounts to millions of dollars. ICI argues that a more accurate figure may be little more than $200,000.[17] The recent case of *Fortner Enterprises*[18] indicates that $200,000 is substantial.

Defendant argues that since the covenant itself is not a contract, combination or conspiracy, the plaintiff must prove a course of conduct amounting to an agreement and it has not done that. On the contrary, defendant argues, the evidence indicates that the policy was unilaterally cancelled and therefore unilaterally imposed.[19] Similarly it asserts the policy was never practiced as a restriction.

The Court disagrees with both points.[20] First, the Court finds that the covenant on its face is an agreement.[21] Its purpose was to restrain the alienation of bulk form griseofulvin.[22] Accordingly, defendant's extrapolation of a merely unilateral policy from the unilateral cancellation, with which the Court also disagrees, is not persuasive.[23] Secondly, it is apparent from the undisputed facts that the conduct of the parties, pursuant to the covenant, both reinforces

---

16. ICI posits that the restriction was of no consequence because the bulk form griseofulvin market is small, competition vigorous, and market shares divided so ICI does not have monopoly power; and, that therefore, no other pharmaceutical concern desired entry. Citing American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); United States v. Aluminum Co. of America, 148 F.2d 416 (2d Cir. 1945). That there is no effect from an agreement which merely reinforces barriers to entry is a non sequitur, even if relevant. *Compare Schwinn, supra*, note 8, *with* White Motor Co. v. United States, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963), and see *infra*, "1. *Schwinn Doctrine*." *Cf.* Brief for the United States at 25-27, United States v. Sealy, Inc., 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967), 9 U.S. Supreme Court Records and Briefs, Pt. II (1966 Term); Brief for Serta Ass'n as Amicus Curiae at 22-23, *id.;* Brief for Appellee, Sealy at 36-37, *id.*

17. Citing *cf.* International Salt v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L. Ed. 20 (1947). *See* United States v. General Dynamics Corp., 258 F.Supp. 36 (S.D.N.Y.1966).

18. Fortner Enterprises v. United States Steel, note 12, *supra*.

19. *Cf.* Motion of Appellee Schwinn to Affirm at 5-6, United States v. Arnold Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), 25 U.S. Supreme Court Records and Briefs, Part XI, 1966 Term.

20. *See generally*, McLaren, Marketing Limitations on Independent Distributors and Dealers—Prices, Territories, Customers and Handling of Competitive Products, 13 Antitrust Bulletin 161, 163 (1968); Groenke, What's New in the Antitrust Aspects of Selecting and Terminating Distributors, *id.*, at 131, 143. Even a unilaterally imposed policy may be enough. *See* Stewart, J. dissenting in *Schwinn, supra*, note 8; Albrecht v. Herald, note 23, *infra*.

21. Undisputed Facts, *supra*, nos. 6, 14, 16, 17 and Hoare affidavit, 5/16/68.

22. *Id.*

23. Albrecht v. Herald, 390 U.S. 145, 150 n. 6, 152 n. 8, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968).

the observation that the covenant is an agreement to restrain the alienation of bulk form griseofulvin and itself is conduct evidencing the operation of the restraint.[24]

■ Defendant ICI has also cross moved for partial summary judgment on the grounds that the case is moot. Citing *Syntax Corporation* from this district, it argues that since the bulk sale restriction has been cancelled there is no case or controversy for the Court to litigate.[25] The Court disagrees. In referring to appropriate relief, the Supreme Court has stated:

> The courts have an obligation, once a violation of the antitrust laws has been established, to protect the public from a continuation of the harmful and unlawful activities. A trial court's wide discretion in fashioning remedies is not to be exercised to deny relief altogether by lightly inferring an abandonment of the unlawful activities from a cessation which seems timed to anticipate suit.[26]

It is therefore apparent that a trial court is justified in looking askance at changes in litigants' positions which occur proximately to the filing of antitrust cases.[27]

The bulk sale restriction in the instant case was cancelled shortly after the defendant learned of the investigation. Accordingly, the Court does not agree that the case is moot.[28]

Defendant's primary contention is that these facts are not subsumed by the *Schwinn*[29] doctrine, that the plaintiff may not have the advantage of any *per se* rule,[30] that the doctrine of ancillary restraints applies[31] and that the case must be judged by the rule of reason after plaintiff has proved precise market effect and defendant has been given a full opportunity to offer further facts to prove the reasonableness of the relationship.[32]

*1. Schwinn Doctrine.* Under *Schwinn*, these facts constitute a *per se* violation of the Sherman Act.[33] Both by way of defense and in support of its own motion for summary judgment, ICI argues that *Schwinn* should be confined to its facts. The language of the majority opinion, however, and the complaint of the dissent presage no such narrow application.[34] *Schwinn* holds:

> Once the manufacturer has parted with title and risk, he has parted with dominion over the product, and his

---

24. *Id.*, at 149–152, 88 S.Ct. 869. *See Schwinn, supra,* note 8; United States v. Parke, Davis Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960).

25. United States v. Syntax Corp., Civil No. 478–68 (D.D.C. Oct. 15, 1968).

26. United States v. Parke, Davis Co., *supra,* note 24, at 48, 80 S.Ct. at 514.

27. *Id. See, e. g.,* United States v. W. T. Grant & Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); United States v. Oregon State Medical Society, 343 U.S. 326, 333, 72 S.Ct. 690, 96 L.Ed. 978 (1952). *Cf.,* United States v. Ward Baking Co., 376 U.S. 327, 84 S.Ct. 763, 11 L.Ed.2d 743 (1964).

28. *Parke, Davis, supra,* note 24.

29. *Supra,* note 8.

30. Citing, *e. g.,* Northern Pacific Ry. Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

31. Addyston Pipe & Steel v. United States, 85 F. 271 (6th Cir.), *aff'd* 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899); United

States v. Columbia Pictures Corp., 189 F.Supp. 153 (S.D.N.Y.1960); *see* United States v. Bausch & Lomb Optical Co., 45 F.Supp. 387 (S.D.N.Y.1942), *aff'd* 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024 (1944).

32. Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911).

33. *Schwinn, supra,* note 8. *See* Note, Vertical Restraints by a Seller are Per Se Unlawful Unless He Retains Title to the Goods, 36 Geo.Wash.L.Rev. 235 (1967).

34. *Compare* Schwinn, *supra,* note 8, 388 U.S. at 379, 87 S.Ct. 1856, *with* Schwinn at 388–389, Justices Stewart and Harlan dissenting. *See,* Keck, Alternative Distribution Techniques—Franchising, Consignment, Agency and Licensing, 13 Antitrust Bulletin 177 (1968); Timberg, The Impact of Antitrust Laws on Multinational Licensing and Franchising Arrangements, *id.,* at 39, 52; Zimmerman, Distribution Restrictions After Sealy and Schwinn, 12 Antitrust Bulletin, 1181 (1967).

effort thereafter to restrict the territory or persons to whom the product may be transferred—whether by explicit agreement or by silent combination or understanding with his vendee—is a *per se* violation of § 1 of the Sherman Act.[35]

*Schwinn* was based in large measure on the ancient rule against restraints on alienation:[36]

> We agree [that the restraints are in the nature of restraints on alienation], and upon remand, the decree should be revised to enjoin any limitation upon the freedom of distributors to dispose of the Schwinn products, which they have bought from Schwinn, where and to whomever they choose. The principle is, of course, equally applicable to sales to retailers and the decree should similarly enjoin the making of any sales to retailers upon any condition, agreement or understanding limiting the retailer's freedom as to where and to whom it will resell the products.[37]

The language of the opinion is clear and unequivocal:[38]

> [W]here a manufacturer *sells* products to his distributor subject to territorial restrictions upon resale, a *per se* violation of the Sherman Act results. And, as we have held, the same principle applies to restrictions of outlets with which the distributors may deal and to restraints upon retailers to whom the goods are sold. Under

the Sherman Act, it is unreasonable without more for a manufacturer to seek to restrict and confine areas or persons with whom an article may be traded after the manufacturer has parted with dominion over it. White Motor, *supra;* Dr. Miles, *supra.* Such restraints are so obviously destructive of competition that their mere existence is enough. If the manufacturer parts with dominion over his product or transfers risk of loss to another, he may not reserve control over its destiny or the conditions of its resale.[39]

■ The defendant here is a manufacturer. It entered into an agreement with its licensee-distributor, AMHO, under which the defendant agreed to sell its product, bulk form griseofulvin,[40] to the licensee and the licensee agreed not to resell it without ICI's permission. ICI maintains that the agreement was an attempt on the part of ICI to ensure uniform standards of health and safety in the preparation of a final product throughout the world. Logically this is a retention of control and dominion over a product after title and risk of loss have passed, after a sale. However laudable the motive and unpredictable the rule, this is, under *Schwinn,* a *per se* violation of section one of the Sherman Act.[41]

Defendant argues that *Schwinn* does not hold that all restraints on alienation are *per se* unlawful.[42] It argues

35. *Schwinn,* at 382, 87 S.Ct. 1856, 1867.

36. *See generally,* Adams v. Burke, 17 Wall. 453, 456, 21 L.Ed. 700 (1873); 2 Coke on Littleton § 360.

37. Schwinn, *supra,* note 8, 388 U.S. at 378, 87 S.Ct. 1856, 18 L.Ed.2d 1249; see text at note 54, *infra.*

38. *See* McLaren, *supra,* note 20, at 166.

39. Schwinn, *supra,* note 8, at 379, 87 S. Ct. 1856.

40. Griseofulvin is not the subject of any U. S. patent and ICI has expressly stated it will not rely on any patent in defense. Accordingly, griseofulvin has been treated as though it were an unpatented product. The case has not been characterized as a patent misuse, patent licensing, or know

how licensing problem. See note 16, *supra,* and note 43, *infra. Compare* Schwinn, *supra,* note 8, at 379 *with* Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911), McLaren, *supra,* note 20, at 170, and Comanor, *infra,* note 53: Whether the product is finished would appear to be of little competitive and no legal consequence; whether a sale is involved is under *Schwinn* the threshold question. *Cf.,* Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 455-456, 60 S.Ct. 618, 84 L.Ed. 852 (1940).

41. Schwinn, *supra,* note 8 at 380, 87 S.Ct. 1856. See notes 40, *supra,* 43 *infra.*

42. Citing, *e. g.,* United States v. Columbia Pictures Corp., note 31, *supra.*

that *Schwinn* only applies to restraints on customers and territories. The Court need not determine whether *Schwinn* goes further than customers and territories for it is apparent from the facts here that the restraint in the instant case is sufficiently broad to cover customers and territories.[43] It is, indeed, a power to prohibit resale altogether, putting the facts at the extreme noted by Mr. Justice Stewart as the original circumstance to which the "hoary formula" applied.[44]

*2. Ancillary Restraints and Schwinn.* Defendant also makes the argument in several different forms that the doctrine of ancillary restraints, not overruled by *Schwinn*, applies here.[45] The Court agrees that the doctrine of ancillary restraints was not overruled by *Schwinn*. It seems clear, however, that the doctrine was ruled out of a *Schwinn*-type sale situation.[46] The Supreme Court found that the mere existence of such restraints was henceforth to be enough to show a violation of the Sherman Act.[47] It considered the doctrine of ancillary restraints specifically only where no sale was involved.[48] It would be presumptuous to say the least for this Court to read the rule of reason back into a sale situation; that possibility has been foreclosed.[49]

Defendant's position is essentially the same as that announced by Justices Harlan and Stewart in their dissent in *Schwinn:* The wooden formula proscribing restraints on alienation is not as rigid as the majority holds; the doctrine of ancillary restraints was a significant part of its meaning and restrictions like those involved in a franchising program *"should"* be able to claim justification under that doctrine with a rule of reason inquiry.[50] A philosophy favoring the burgeoning franchising system [51]

43. The Government has argued that all restraints, whatever the form, on the alienation of any goods, patented or unpatented, are *per se* unlawful: Adams v. Burke, *supra*, note 36; United States v. General Electric, *supra*, note 42; Boston Store v. American Graphophone, 246 U.S. 8, 21, 33, 38 S.Ct. 257, 62 L.Ed. 551 (1918); Ethyl Gasoline Corp. v. United States, *supra*, note 40; Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871 (1947); United States v. Univis Lens Co., 316 U.S. 241, 250, 252, 62 S.Ct. 1088, 86 L.Ed. 1408 (1942); United States v. Bausch & Lomb Optical Co., *supra*, note 31; Hensley Equipment Co. v. Esco Corp., 383 F.2d 252 (5th Cir. 1967). The facts before the Court are not that encompassing. See ICI answer to plaintiff's interrogatory #47. Here, the goods are not the subject of a U. S. patent and ICI has disclaimed any reliance on its patents. The Court finds from the argument and memoranda, therefore, that it need not rule on whether *Schwinn* applies to patented goods. *See* note 40, *supra*, and *Schwinn* at n. 6. Similarly, neither the litigants nor the Court have attempted to characterize this as a tie in. *See also* Atty. Gen. Report at 172 n. 14, 186–188 (know-how licensing) (Supplement, 1968).

44. Schwinn, *supra*, note 8 at 390, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (Stewart, J. dissenting).

45. United States v. Columbia Pictures Corp., *supra*, note 31. *See,* United States v. Sealy, 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967); Northern Pacific v. United States, *supra*, note 30; United States v. Bausch & Lomb Optical Co., *supra*, note 31; Addyston Pipe & Steel v. United States, *supra*, note 31; Packard Motor Car Co. v. Webster Motor Car Co., 100 U.S.App.D.C. 161, 243 F.2d 418 (1957), *cert. denied,* 355 U.S. 822, 78 S. Ct. 29, 2 L.Ed.2d 38 (1957).

46. *Schwinn, supra,* note 8, 388 U.S. at 380, 87 S.Ct. 1856, 18 L.Ed.2d 1249; see notes 40, 43 *supra.*

47. *Id.,* at 382, 87 S.Ct. 1856.

48. *Id.,* at 380–381, 87 S.Ct. 1856.

49. *Compare* White Motor Co. v. United States, 372 U.S. 253, 263, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963) *with Schwinn, supra,* note 8 at 379, 87 S.Ct. 1856, and *with Schwinn* at 389, 87 S.Ct. 1856 (Stewart, J. dissenting). *See generally,* Keck, *supra,* note 34.

50. *Id.,* at 392, 87 S.Ct. 1856. See Note, *supra,* note 33 and note 31. *Cf.* Brief for the United States, at 25–27, United States v. Sealy, Inc., *supra,* note 16.

51. *See generally,* Zeidman, The Growth and Importance of Franchising—Its Impact on Small Business, 12 Antitrust Bulletin 1191 (1967).

as both a boon to competition and as an opportunity for the survival of the individual "mom and pop" business underpins this position and lends to defendant's argument the "ring of something familiar."[52] Persuasive as that theory may seem,[53] however, it is foreclosed to these facts by the majority opinion in *Schwinn* which took a different view in regard to sale situations.

The majority stated:

To permit this would sanction franchising and confinement of distribution as the ordinary instead of the unusual method which may be permissible in an appropriate and impelling competitive setting, since most merchandise is distributed by means of purchase and sale. On the other hand, as indicated in *White Motor*, we are not prepared to introduce the inflexibility which a *per se* rule might bring if it were applied to prohibit all vertical restrictions of territory and all franchising, in the sense of designating specified distributors and retailers as the chosen instruments through which the manufacturer, retaining ownership of the goods, will distribute them to the public. Such a rule might severely hamper smaller enterprises resorting to reasonable methods of meeting the competition of giants and of merchandising through independ-

ent dealers, and it might sharply accelerate the trend towards vertical integration of the distribution process. But to allow this freedom where the manufacturer has parted with dominion over the goods—the usual marketing situation—would violate the ancient rule against restraints on alienation and open the door to exclusivity of outlets and limitation of territory further than prudence permits.[54]

Accordingly, this Court may not consider the reasonableness of the restriction or its business justification in mitigation of illegality.[55]

For these reasons, the Court finds, beyond peradventure of doubt, a *per se* violation of section one of the Sherman Act and will grant the motion of the Government for a partial summary judgment. It will deny the motion of ICI for summary judgment.

## III. JURISDICTION AND STANDING PACKAGE

Defendant ICI has moved under Rule 12(c) for a judgment that the Court does not have jurisdiction to determine and/or that the United States does not have standing to challenge the validity of the ICI patent.

United States v. United States Gypsum [56] noted that where a party raises

---

52. *Schwinn, supra,* note 8 at 386–387, 87 S.Ct. 1856. *Cf.,* United States v. Von's Grocery Co., 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966); Alioto & Blecher, Antitrust in Galbraith's New Industrial State, 13 Antitrust Bulletin 215 (1968). *See generally,* Timberg, *supra,* note 32.

53. But, *compare* authority cited notes 31 and 32 *with* Comanor, Vertical Territorial and Customer Restrictions: White Motor and Its Aftermath, 81 Harv.L.Rev. 1419 (1968), where the author argues that all customer and territorial restrictions should be *per se* unlawful regardless of sale-consignment distribution.

54. *Schwinn, supra,* note 8 at 379, 87 S.Ct. 1856, 1866. Defendant mentions that there is no evidence of market shares, characterizing such evidence as "ordinarily highly relevant to antitrust inquiry." The Court understands this argument to be pressed only in connection with an ac-

ceptance of defendant's theory that the rule of reason applies. Market shares and market effect were important to the approach of *White Motor* where it was necessary to determine whether a slight restraint on intrabrand competition actually resulted in a significant increase in interbrand competition. *Schwinn,* however, not *White Motor,* controls in the instant situation.

55. *Id.,* at 388, 87 S.Ct. 1856. *See also,* Times-Picayune Pub. Co. v. United States, 345 U.S. 594, 614, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); United States v. Griffith, 334 U.S. 100, 108, 68 S.Ct. 941, 92 L.Ed. 1236 (1948); United States v. Patten, 226 U.S. 525, 543, 33 S.Ct. 141, 57 L.Ed. 333 (1913). ICI is, of course, held to have intended the necessary consequences of its acts.

56. 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

a patent in defense of an antitrust suit the United States plaintiff may challenge the validity of that patent. The Supreme Court distinguished this situation in which the Government was suing for violation of the antitrust laws from that of *Bell Telephone* [57] where the Government was suing to cancel a patent on the ground of invalidity.[58] In the instant case, defendant ICI has filed affidavits swearing that it does not intend, and in any event will not, raise its patent in defense of the antitrust claims. United States v. United States Gypsum,[59] therefore, is inapposite. Accordingly, the issue is whether the United States can challenge ICI's patent independent of any antitrust claims.

A review of the patent laws indicates that there has been a particular, if also serpentine, development of a right on the part of the Government to sue in United States District Court for a declaration of invalidity of a patent only on the grounds of "fraud or deceit." [60] The patent acts of 1790 [61] and 1793 [62] contained provisions under which a private party could, upon allegations of fraud, petition a district court judge to issue an order for a patentee to show cause why his letters patent should not be repealed.[63] The provision was inexplicably omitted from the 1836 act [64] which did, however, include several new statutory defenses to private infringement action.[65]

In 1871 in Mowry v. Whitney, the Supreme Court decided that the omission from the 1836 act of the specific right precluded a private party from suing to cancel.[66] It was noted that the alleged fraud was perpetrated, if at all, on the United States, not the individual. In 1876, a district court in Rhode Island held that the Attorney General was not the proper party to bring a suit for cancellation.[67] In *dictum* it argued that the *Mowry* [68] case merely noted that the public relied on the Government for protection; what if any protection had been afforded was still in doubt. It then noted that jurisdiction to afford protection had been lodged in the Commissioner of Patents with a limited right to appeal to the courts. Collateral attack was thus precluded. Seven years later a district court in New York disagreed with the *Hecker* case [69] and held that while specific statutory authorization was needed for a private individual to sue for cancellation, as between the grantor (the United States) and the grantee (the Patentee), when it is alleged that fraud was practiced on the grantor, it must have the right to sue for cancellation.[70] The importance of the notion that the complaint involves a fraud practiced on the United States— that is, that the United States was the party in interest—was emphasized shortly thereafter in the *Frazer* case [71] when a district court in Illinois dismissed a suit for cancellation based on

57. United States v. American Bell Telephone Co., 128 U.S. 315, 9 S.Ct. 90, 32 L.Ed. 450 (1888) ; United States v. American Bell Telephone Co., 167 U.S. 224, 17 S.Ct. 809, 42 L.Ed. 144 (1897).

58. *Gypsum, supra*, note 56, at 387, 68 S.Ct. 525.

59. *Id.*

60. United States v. American Bell Telephone, *supra*, note 57. *See* Cullen & Vickers, Fraud in the Procurement of a Patent, 39 Geo.Wash.L.Rev. 110 (1960). This article presents in greater detail the history reviewed and condensed here. *Id.*, at 112–117.

61. Act of 1790, § 5, 1 Stat. 109.

62. Act of 1793, § 10, 1 Stat. 318.

63. *E. g.*, Ex parte Wood & Brundage, 22 U.S. 603, 6 L.Ed. 171 (1824).

64. Act of 1836, 5 Stat. 117.

65. Act of 1836, § 15, 5 Stat. 117.

66. Mowry v. Whitney, 81 U.S. 434, 20 L.Ed. 858 (1871).

67. Attorney General ex rel. Hecker v. Rumford Chemical Works, 32 F. 608 (D.R.I.1876).

68. *Mowry, supra*, note 66.

69. *Supra*, note 67.

70. United States v. Gunning, 18 F. 511 (D.N.Y.1883).

71. United States v. Frazer, 22 F. 106 (N.D. Ill.1884).

a notorious fraud because private parties had put up the requisite bond evidencing their paramount interest in the case.

Against this background in 1888, the issue was presented to the Supreme Court.[72] Relying heavily on *Mowry*,[73] it held in United States v. American Bell Telephone that the Government could sue to obtain the cancellation of a fraudulently procured patent:

> This [patent right] has been taken from the people, from the public, and made the private property of the patentee by the action of one of the departments of the government acting under the forms of law, but deceived and misled, as the bill alleges, by the patentee. That the government, authorized both by the constitution and the statutes to bring suits at law and in equity, should find it to be its duty to correct this evil, to recall these patents, to get a remedy for this fraud, is so clear that it needs no argument; and we think we have demonstrated that the proper remedy is the one adopted by the government in this case.[74]

The Government argues that the *Bell* case held that the Government could sue independently to cancel a patent on the grounds of "fraud, mistake or error as to power" and that the challenge here sought is an "error as to power." The Court disagrees on both points.

First, even if it were the case that the phrase "error as to power" stands unqualified, the Government's claim here would not fit its rubric, for it is only in the sense that any error may be characterized as an "error as to power" that the challenge here would fit the phrase.

Second, perhaps because of the ambiguity of the phrase, the second occasion the *Bell* case came up, the Court, though not necessary to its holding, specifically noted that the language of its former opinion was not to be read broadly.[75] After characterizing that former language as "general," it noted:

> But while there [in the first *Bell*, case] was thus rightfully affirmed the power of the government to proceed by suit in equity against one who had wrongfully obtained a patent for land or for an invention, there was no attempt to define the character of the fraud, or deceit or mistake, or the extent of the error as to power which must be established before a decree could be entered cancelling the patent. It was not affirmed that proof of any fraud, or deceit, or the existence of any error on the part of the officers as to the extent of their power, or that any mistake in the instrument was sufficient to justify a decree of cancellation. Least of all was it intended to be affirmed that the courts of the United States, sitting as courts of equity, could entertain jurisdiction of a suit by the United States to set aside a patent for an invention on the mere ground of error of judgment on the part of the patent officials. That would be an attempt on the part of the courts in collateral attack to exercise an appellate jurisdiction over the decisions of the patent office, although no appellate jurisdiction has been by the statutes conferred. We are of the opinion, therefore, that the question, as stated, is not open for consideration in this case.[76]

Thus, the present state of the most apposite case law strictly interpreted indicates that the Government may only sue to cancel a patent when "fraud or deceit" is alleged. The notion underpinning this is that a fraud perpetrated on the United States should be actionable by it. Correspondingly, the Government may not sue to cancel a

72. United States v. American Bell Telephone, 128 U.S. 315, 9 S.Ct. 90, 32 L.Ed. 450 (1888).

73. *Supra*, note 66.

74. First Bell Telephone, *supra*, note 72 at 370, 9 S.Ct. 90, 98, 32 L.Ed. 450.

75. United States v. American Bell Telephone Co., 167 U.S. 224, 17 S.Ct. 809, 42 L.Ed. 144 (1897).

76. *Id.*, at 269–270, 17 S.Ct., at 821–822.

patent for any reason. It may not sue when to do so would merely collaterally attack the judgment of the Commissioner.[77]

The Government, relying on an argument of public policy extrapolated from the *San Jacinto Tin 'Company* case of 1888,[78] states that there is a strong public interest in proper policing of the patent system and tautologically notes that the sovereign grant of limited monopolies through patents must be carefully scrutinized. Then, by analogy to other areas, it argues that where there is a powerful public interest entrusted to the Government, there is necessarily a correlative right in the Government to sue to protect its interest. It argues, in effect, that the language of the *Bell cases* should be read broadly to recognize a dormant, inherent power in the Department of Justice to attack collaterally the validity of patents on any grounds.[79] The Court disagrees.

The patent system is an intricate if sometimes excoriated structure and unlike the areas to which the Government analogizes, a section of the Government which has already been devoted to concern itself with this interest.[80] A specific agency has been authorized under highly particularized circumstances to grant patents. Limited rights of review and appeal from that decision exist.[81]

Others have been proposed.[82] Even in this limited context (which the Government would now broaden), where the granting agency and the enforcing body are separate, there is undesirable confusion, expense and corresponding waste:

Further, the [President's] Commission [on the Patent System] apparently never recognized the anomaly which allows the governmental "enforcement agency," the judiciary, to operate entirely apart from the "granting agency," the Patent Office. There is a total lack of communication between these two separate "agencies" when it is needed most—when the validity and scope of a patent are in question. This was high-lighted recently in American Cyanamid Company v. FTC where the important issue of whether the Patent Office Examiner had been misled was debated by both sides—undoubtedly at great expense—until the Court of Appeals for the Sixth Circuit, with ineluctable logic, suggested that someone ought to ask the Examiner whether he was misled.[83]

Proposals for revision have been rejected by Congress.[84] Commentators have suggested that the authority of the United States to sue to cancel a patent should be broadened beyond situations where it is alleged that a fraud has been practiced upon it.[85] Others have argued that an

---

77. *Id.*

78. United States v. San Jacinto Tin Co., 125 U.S. 273, 8 S.Ct. 850, 31 L.Ed. 747 (1888).

79. Kennedy, Patent and Antitrust Policy: The Search for a Unitary Theory, *supra*, note 7; *cf.* United States v. Singer Mfg. Co., 374 U.S. 174 at 197–200, 83 S.Ct. 1773, 10 L.Ed.2d 823 (White, J. concurring) (1963).

80. Report of the President's Commission on the Patent System (1966); Rich,. Commentary—Proposed Patent Reform, 1967, 36 Geo.Wash.L.Rev. 95 (1967).

81. *Id. See,* e. *g.,* Morgan v. Daniels, 153 U.S. 120, 14 S.Ct. 772, 38 L.Ed. 657 (1894); Reynolds v. Aghnides, 123 U.S. App.D.C. 28, 356 F.2d 367 (1966); Stieg

v. Commissioner of Patents, 122 U.S.App. D.C. 361, 353 F.2d 899 (1965).

82. Symposium, Commentary—Proposed Patent Reform, 1967, 36 Geo.Wash.L.Rev. 95–143 (1967).

83 *Id.,* at 112.

84. See *id.*

85. Note, 48 Yale L.J. 1095, (1939), where at 1099 the author argues that "Neither Congress, nor President, nor Patent Office, under the present statute, may repeal letters—patents once they have issued. By default as well as by historical analogy the power must lie with the courts." This assumes that the power is not one intentionally withheld or which if granted would not upon careful study be granted to for instance the Patent Office.

"inherent power" such as the Government here suggests should be utilized.[86] Still others lament that because (as of 1960) the Government had sued only nine times to cancel a patent on the grounds of fraud, any expansion of power to sue to cancel would be practically meaningless; the Government rarely uses the power it has.[87] Similarly, it is noteworthy that there are alternative means of protecting the interest now asserted by the Government which merit careful evaluation.[88]

With these variables in mind, it would be impetuous for this Court to set about curing the ills of both the patent system and the antitrust laws in a "wreck and rebuild" fashion by fertilizing a dormant power in the Department of Justice to challenge patents collaterally for any reason. The Supreme Court has noted two exceptions to a system which precludes the Government from independently seeking the cancellation of a patent. Neither of the exceptions applies to the facts now before the Court.[89]

■ Accordingly, the motion of defendant ICI under Rule 12(c) will be granted and the challenged paragraphs of the complaint will be ordered stricken.

## IV. MOTION TO AMEND THE COMPLAINT PACKAGE

The United States has moved to amend its complaint to: (1) allege an additional violation of the antitrust laws in the form of a conspiracy to boycott; (2) to add two defendants allegedly involved in the proposed alleged boycott violation—Johnson and Schering; and (3) to allege the invalidity of an additional patent held by Glaxo. In support of its motion the Government argues that the additional charges concern a related violation of the antitrust laws arising from and being in furtherance of the matters concerned in the charges brought in the original complaint. Moreover, it argues that discovery is nearly complete in this case and would have to be duplicated wastefully were it relegated to bringing a separate suit.

■ The Court disagrees and will deny the motion to amend the complaint. First, the Court has granted the motion of Johnson and Schering, the proposed new defendants, to intervene and has considered their arguments.[90]

Second, the earlier section of this opinion which grants ICI's motion for a judgment under 12(c) holds that the Government may not independently attack the validity of patents in these proceedings. Similarly, the Government also may not amend its complaint to allege the invalidity of an additional patent unless it comes within the rule of the *Gypsum case* or alleges "fraud or deceit."[91] Since there is no indication that either situation will obtain here, that part of the motion to amend is necessarily denied.[92]

Considering the arguments of both present and proposed defendants and having reviewed the state of the ponderous record thus far compiled, the Court will also deny the remainder of the motion to amend. The record reveals that discovery is nearly complete and the case is in its terminal pretrial stages. The Gov-

---

86. Kennedy, *supra*, note 7.

87. *Id.*, at 536–537; Cullen & Vickers, *supra*, note 58.

88. Cullen & Vickers, *supra*, note 58 at 117.

89. United States v. United States Gypsum, *supra*, note 56; United States v. American Bell Telephone, *supra*, note 57. *See* United States v. Cold Metal Process Co., 57 F.Supp. 317 (N.D.Ohio 1944), *aff'd* 164 F.2d 754 (6th Cir. 1947), *cert. denied* 334 U.S. 811, 68 S.Ct. 1016, 92 L.Ed. 1742 (1948), *rehearing denied* 334 U.S. 835, 68 S.Ct. 1343, 92 L.Ed. 1761 (1948).

90. 3A Moore, Federal Practice, ¶ 21.05, at 2909 (2d Ed. 1967). *See* United States v. National Screen Service Corporation, 20 F.R.D. 226 (S.D.N.Y.1957); Looper v. Colonial Coverlet Co., 29 F.Supp. 121 (E.D.Tenn.1939).

91. United States v. United States Gypsum Co., *supra*, note 56.

92. Without prejudice to its renewal, of course, should a *Gypsum* problem arise.

ernment's argument that it would be wasteful to have to duplicate this discovery is specious. Indeed, the theory of the Government's argument is a solid basis for the defendant's position: To allow amendment with the case in its terminal stages would promote extended and unnecessary delay. All of the discovery thus far, which the Government admits is substantial, would have to be duplicated in any event since the proposed defendants were not parties to, for instance, the numerous depositions. Under Rule 26(d) the discovery would not be admissible against them.[93]

The Government has volunteered that it could file an independent suit to charge the matters alleged in the proposed amendment. Since discovery would have to be repeated anyway, it appears there would be no substantial hardship to the Government in following this separate course. On the other hand, to allow amendment would promote delay in a case nearly through its pretrial stages and hardship to the defendant parties involved.

In addition, the Court notes that the proposed defendants are not necessary parties to the present litigation;[94] and moreover, the proposed charges are not directly related, in a legal sense, to those near disposition in the original complaint.[95] The new allegations charge Glaxo and the proposed defendants with a scheme illegally to boycott another corporation. It is not clear that ICI would be involved in this new charge and it is only from the Government's argument in support of its motion to amend that the Court is aware that it might argue that this is all one scheme involving all de-

fendants named. It thus appears that the requirements of Rule 20(a) have not been met.

The Court recognizes that this is primarily a matter of characterization and it has accordingly carefully compared the instant case to the situation in Continental Ore Company v. Union Carbide & Carbon Company.[96] There the Supreme Court stated that it was improper to consider as fragmented the individual charges comprising an overall scheme including both section one and section two Sherman Act charges. The Government relies on this case for the proposition that it would be error for it to bring separate suits and that amendment should be permitted.

*Continental Ore* did not, however, involve the problem of amending the complaint. The consideration involved there was the approach of a Court of Appeals to the review of a jury verdict. None of the countervailing considerations present here, such as hardship and delay, were involved there. There is no indication that the complaint was amended on the eve of trial. The Government's lack of preparation, for whatever reason and however unavoidable, here should not work to the prejudice of the defendants.

Accordingly, the Government's motion to amend the complaint will be denied.

## V. DISCOVERY PACKAGE

In light of the Court's rulings on the previous motions, disposition of at least some of the discovery motions may be unnecessary. The Court's disposition of

93. American Photocopy Equip. Co. v. Rovico, Inc., 384 F.2d 813 (7th Cir. 1967), *cert. denied* 390 U.S. 945, 88 S.Ct. 1030, 19 L.Ed.2d 1133 (1968). *See* Benger Labs. Limited v. R. K. Laros Co., 24 F.R.D. 450 (E.D.Pa.1959).

94. Parker v. Broadcast Music, Inc., 30 F.R.D. 151 (S.D.N.Y.1962); Benger Labs. Limited v. R. K. Laros Co, *supra*, note 93; United States v Nationwide

Trailer Rental System, Inc., 156 F.Supp. 800 (D.Kan.1955), *aff'd per curiam* 355 U.S. 10, 78 S.Ct. 11, 2 L.Ed.2d 20 (1957).

95. Philadelphia Dressed Beef Co. v. Wilson Co., 19 F.R.D. 198 (E.D.Pa.1956). *See also* Music Merchants, Inc. v. Capitol Records, Inc., 20 F.R.D. 462 (E.D.N.Y.1957).

96. Continental Ore Co. v. Union Carbide & Carbon Co., 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962).

the following motions, which appear to be still of possible relevance, and the omission of others, is, therefore, without prejudice to the renewal of those not here decided.

## A. NOVEMBER 25, 1968, PRETRIAL RULING

The United States has objected to certain of Glaxo's interrogatories which seek, among other identifying detail, the names and addresses of the parties to communications which the Government claims fall within the work product rule.[97] On November 25, 1968, the Pretrial Examiner sustained the Government's objections. Glaxo objects to that ruling.

The Government's resistance to this discovery is two-fold. First, it argues that identifying the documents withheld as work product would defeat the work product rule.[98] Secondly, it argues the names and addresses are protected by the informer's privilege.[99]

■ As to the second, it seems undisputable that if, as Glaxo argues, the names have already been made public or communicated to Glaxo, or soon will be, secrecy has been breached and the privilege should be no bar.[100] Nor does the Court find any basis for agreeing with the first of the Government's arguments. The work product rule protects, as the phrase implies, work product, not the fact of its existence or non-existence and correspondingly not its common identity.

Even where the work product doctrine applies, it protects only documents obtained by or for the attorney, and his

mental impressions or conclusions. It does not furnish any shield against discovery, by interrogatories or by deposition, of the facts which the adverse party's lawyer has learned, or the persons from whom he has learned such facts, or the existence or nonexistence of documents, though the documents themselves may have a qualified immunity from discovery.[101]

The cases upon which the Government relies either restate the familiar rule or apply it to communications to an attorney.[102] Unquestionably a communication to an attorney in connection with particular litigation may be, among other privileges, work product. But it is the substance of the communication which is protected, not its identity, unless, of course, on certain peculiar facts an identity is also claimed to be work product.[103]

■ While, for instance, in good faith the Government might claim a particular communication reflects confidential work product, unknown to the Government that communication or its substance may have been published by one of its other parties. Should such revelation have occurred, the seekers would be entitled to request it from the alternative source. That is what the Court understands to be claimed here. That conforms to the spirit of the discovery rules without violating the philosophy of the work product rule. If anywhere, "trial by ambush" is to be avoided in complex antitrust litigation. Accordingly, Glaxo's objections will be sustained. The order of the Pretrial Examiner of November 25, 1968, is overruled.

97. Hickman v. Taylor, 329 U.S. 495, 513, 67 S.Ct. 385, 91 L.Ed. 451 (1947).

98. *Id. See* United States v. American Optical Company, 37 F.R.D. 233, 236–237 (E.D.Wis.1965).

99. *See* Roviaro v. United States, 353 U.S. 53, 61, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957).

100. The informer's privilege protects an informer's identity, not the facts he may disclose. *Id.*

101. Barron & Holtzoff, 2A Federal Practice and Procedure, § 652.2, p. 139.

102. *E. g.*, United States v. American Optical Co., *supra*, note 98.

103. *See* McCall v. Overseas Tankship Corp., 16 F.R.D. 467, 469 (S.D.N.Y. 1954) ; Cities Service Oil Co. v. Celanese Corp. of America, 14 F.R.D. 246 (D.Del. 1953).

## B. NOVEMBER 6, 15, 1968, PRE-TRIAL RULINGS

The United States has objected to rulings of the Pretrial Examiner dated November 6 and November 15, 1968, and has moved the Court under Rule 37 to compel answers to certain interrogatories. In light of the Court's disposition of defendant's Rule 12(c) motion and its denial of the Government's motion to amend much of this discovery controversy is moot.

 The remaining controversy is over an interrogatory seeking defendants' contentions with respect to any justifications they may urge in defense of allegedly unlawful restrictive provisions. Defendants object on the grounds that the query demands legal contentions, not properly discoverable in this jurisdiction.[104] The Court agrees.

The Government relies primarily on a Delaware case which held that certain contentions were discoverable in the context of a patent case.[105] It also cites a proposal before the Judicial Conference.[106] Neither of these authorities, even if applicable to this antitrust case, is as compelling as the decision in this jurisdiction in United States v. Maryland and Virginia Milk Producers Association.[107] There Judge Holtzoff held that legal contentions are not subject to discovery:

> To answer it would be, in effect, to submit a skeletonized brief on the facts and the law. It is not the purpose of discovery to ascertain what arguments the opposing party intends to use in support of his contentions.[108]

Accordingly, the United States' objections to the ruling of the Pretrial Examiner will be overruled.

---

104. *E. g.*, United States v. Maryland and Virginia Milk Producers Ass'n, 22 F.R.D. 300 (D.D.C.1958). *See* Fishermen & Merchants' Bank v. Burin, 11 F.R.D. 142 (S.D.Cal.1951).

105. Montecatini Edison, S.p.A. v. Rexall Drug & Chemical Co., 288 F.Supp. 486 (D.Del.1968).

106. Preliminary Draft of Proposed Amendments to Rules of Civil Procedure for the United States Courts (Nov.1967), Rule 33(b).

107. *Supra*, note 104.

108. *Id.*, 22 F.R.D. at 302.